UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN THOMAS WOLFENBARGER,

      Petitioner,                          Case No. 07-CV-10835
                                           Honorable Bernard A. Friedman

v.

KENNETH T. MCKEE,

      Respondent.

_____/

## OPINION AND ORDER DENYING
## PETITION FOR WRIT OF HABEAS CORPUS

John Thomas Wolfenbarger ("Petitioner"), a state inmate currently incarcerated at the

Marquette Branch Prison in Marquette, Michigan, through counsel, has filed a petition for writ

of habeas corpus pursuant to 28 U.S.C. § 2254, asserting that he is being held in violation of his

constitutional rights.  Petitioner was convicted of (1) five counts of first-degree premeditated

murder, MICH.COMP.LAWS 750.316(1)(a), (2) five counts of felony murder, MICH.COMP.LAWS

750.316(1)(b), (3) five counts of armed robbery, MICH.COMP.LAWS 750.529, (4) felon in

possession of a firearm, MICH.COMP.LAWS 750.224f, and, (5) possession of a firearm during the

commission of a felony, MICH.COMP.LAWS 750.227b.  For the reasons set forth below, this

Court denies the petition for writ of habeas corpus.

## I.  Facts

# A. Procedural History

Petitioner was tried, along with co-defendant Dennis Lincoln, before two separate juries in Wayne County, Michigan, Circuit Court. Petitioner's jury convicted him of the above-stated charges. On May 27, 2003, the trial court sentenced Petitioner, as a habitual offender–fourth, to life imprisonment without parole for the murder convictions, life imprisonment for the felon-in-possession-of-a-firearm conviction, and two-years for the felony-firearm conviction.

Subsequently, Petitioner filed a direct appeal with the Michigan Court of Appeals, raising the following seven claims:

    I.      Whether the trial court erred in refusing to change venue in this highly publicized murder trial that resulted in a jury that was inadequately questioned by the trial court during *voir dire* and statistically over exposed and influenced by the media's reports and rush to judgment against [Petitioner].

    II.     Whether the trial court erred for failing to excuse jurors for cause who had articulated extensive media exposure and/or bias against [Petitioner] before trial began.

    III.    Whether the trial court's refusal to grant the defense-based motion to excuse jurors for cause forced [Petitioner] to exercise at least six if not seven of his peremptory challenges and the error was exacerbated by the trial judge's refusal to grant additional peremptory challenges to the defense in this highly-publicized-murder trial.

    IV.    Whether the trial court denied [Petitioner] his constitutional right to present a defense by improperly invoking the hearsay rule to bar statements and testimony that would have raised reasonable doubt about [Petitioner's] guilt of the offense.

    V.     Whether the trial court violated [Petitioner's] constitutional right to the presence of counsel during a critical stage of the proceedings by failing to appoint temporary or stand-in

counsel for the purpose of instructing the jurors with misleading information and adjourning the trial after the defense attorney had a heart attack in the middle of the proceedings.

VI. Whether the trial court violated [Petitioner's] right to be free from double jeopardy under the United States and Michigan Constitutions where the court sentenced [Petitioner] for first-degree premeditated murder, first-degree felony murder, and the underlying felony of armed robbery.

VII. Whether [Petitioner's] sentence of life in prison for being a felon-in-possession-of-a-firearm represents a departure from the legislative sentencing guidelines without substantial and compelling reasons for the departure.

On March 8, 2005, the Michigan Court of Appeals issued an unpublished *per curiam* opinion affirming Petitioner's convictions, but remanded for resentencing. *People v. Wolfenbarger*, No. 250430, 2005 WL 544162 (Mich.Ct.App. Mar. 8, 2005) ("remand for modification of defendant's judgment of sentence to reflect five counts of first-degree murder supported by two theories: premeditated murder and felony murder, vacation of defendant's armed robbery convictions and rearticulation of the reason or reasons justifying the trial court's departure from the guidelines in sentencing defendant to imprisonment for life for the felon-in-possession-of-a-firearm conviction").  Subsequently, Petitioner filed an application for leave to appeal that decision in the Michigan Supreme Court, raising the first five claims as raised in the Michigan Court of Appeals.  On November 29, 2005, the Michigan Supreme Court denied leave to appeal.  *People v. Wolfenbarger*, 474 Mich. 933, 706 N.W.2d 27 (2005).


Petitioner has now filed the pending petition for writ of habeas corpus raising the following claims:

I.    The trial court erred in refusing to change venue in this highly-publicized-murder trial which resulted in a jury that was inadequately questioned by the trial court during *voir dire* and statistically over-exposed and influenced by the media's reports and rush to judgment against [Petitioner].

    A.    The trial court's superficial and extremely suggestive *voir dire* did not adequately enlighten the parties about the extent of the media's influence on these jurors and constituted an abuse of discretion.

    B.    The defense motion for change of venue was erroneously denied where there was excessive pre-trial publicity that negatively portrayed [Petitioner] and nearly every juror admitted to awareness of this case through the media or community prior to trial.

II.   The trial court denied [Petitioner] his constitutional right to present a defense by improperly invoking the hearsay rule to bar a statement and testimony that would have raised reasonable doubt about [Petitioner'] guilt of the offenses.

III.  The trial court violated [Petitioner's] constitutional right to the presence of counsel during a critical stage of the proceedings by failing to appoint temporary or stand-in counsel for the purpose of instructing the jurors with misleading information and adjourning the trial after the defense attorney had a heart attack in the middle of the proceedings.

### B.  Trial Proceedings and Evidence

This case arose out of the murders of five family members.  The incident occurred on December 21, 2002, at the home of Marco Pesce, in Livonia , Michigan.  Marco Pesce, Marco's mother, Maria Vergati, and Marco's three children, twelve-year-old Carlo Pesce, nine-year-old Sabrina Pesce, and six-year-old Melissa Pesce, were found dead in the home.

The crime received extensive media coverage.  In Petitioner's motion for a change of venue in the trial court, numerous samplings of newspaper and television coverage were made

part of the record.  For example, the Livonia Police Department pleaded for public assistance in finding the killers.  Updates of the case were reported daily by most television networks and newspapers in the Detroit metropolitan area; the coverage included television reports and videotaped footage of Petitioner's arrest for his role in the killings.  One television station made a documentary-style-news report that tracked and detailed co-defendant, Dennis Lincoln's, post-arrest confession.  As a result, the trial court granted Petitioner's request for separate juries in light of Lincoln's confession, which implicated Petitioner as the primary perpetrator of the crime but denied Petitioner's request for a change of venue.

The prosecution's theory of the case was that Marco Pesce was stalked by Petitioner, and Lincoln, in an effort to rob him of money and jewelry.  Marco Pesce, an Italian immigrant, owned Italia Jewelry in Livonia, Michigan.  According to the testimony of Anita Douglas, who was a friend of Mr. Pesce's who also worked at his store on occasion, testified to the following.

Ms. Douglas testified that, on the day in question, Mr. Pesce worked part of the day in the store and then left for a short period of time in the afternoon to take his three children to see their mother, Diane Pesce,[1] who was a resident in a treatment program for crack and alcohol abuse in Ann Arbor, Michigan.  The three children spent the afternoon with their mother and made a prearranged trip to a movie theater.  After returning to the treatment facility, Carlo called his father to come and pick them up so that they could go home.

According to Ms. Douglas' testimony, Mr. Pesce picked up his children around 5:00 p.m. and told his former wife that he intended to drop the children off at his house and then return to

---

[1]Mr. Pesce was divorced from Diane Pesce.

work for a while.  Mr. Pesce's mother, Maria Vergati, who was visiting from Italy, was at the house and would watch the children.  Shortly after Mr. Pesce returned to his store, his son, Carlo, called him at the store, asking that he come home because his sister, Melissa, had fallen and had chipped her tooth.  It was Ms. Douglas' testimony that Mr. Pesce immediately left the store.

Stephano Pesce, the twelve-year-old nephew of Mr. Pesce, testified that, on the night of December 21, 2002, he was trying to call his cousin, Carlo, to finalize plans to go to a party that evening, somewhere between 5:00 and 6:00 p.m., about the same time that Mr. Pesce was on his way home from his jewelry store.  Stephano said that Carlo answered his initial call and told him that he could not talk and to call back.  Stephano called back a few minutes later, at which time Carlo confirmed their plans.  However, Stephano said that he heard a man's voice in the background, telling Carlo to hang up the phone.

Stephano and his family arrived at the Pesce home shortly before 7:00 p.m., as planned, but no one answered the door or any of the calls that they made to the Pesce home telephone.  According to Stephano's testimony, he saw his uncle's cars in the driveway.  Stephano said that he, and his and family, walked around the house and tried to open various doors, without success.  Receiving no answer at the home, they proceeded to the party.

However, Stephano's father, Fabrizio Pesce, was concerned, and by the next morning, when they had not heard from Marco and his family, he called the police.  The police then went to Mr. Pesce's home and found him (Marco), his mother, and the three children dead inside of the home.  Mr. Pesce's mother had been shot one time in the chest while in a seated position on the couch; the bullet directly hit her heart.  The police did not find signs of a struggle.  Mr. Pesce and his three children were found lying in a circular pattern on the basement floor; all four had

been shot one time in the back, suffering fatal injuries to their lungs and hearts. The bullets from the victims were found underneath the bodies, suggesting that they were shot where they were found, with the exception of Melissa Pesce; the bullet that killed her was found approximately twelve inches from her body. There was no obvious gunpowder on any of the bodies, again suggesting that they were shot at close range, perhaps using a pillow to filter out that evidence.

When the police arrived at the scene, they did not find any signs of a forced entry. Rather, they found a closet door, which led to a safe in the basement, broken. The master bedroom was ransacked, as well as Carlo Pesce's room. In the course of the investigation of the crime, the police checked the home for fingerprints, DNA, and trace evidence. Twenty-nine potentially identifiable fingerprints were obtained; five of those found in the master bedroom matched the victims and Diane Pesce. The other prints were not identifiable.

According to the prosecution, Marco Pesce was not the first jewelry-store owner that Petitioner and Lincoln stalked. Linda Keimig testified that she remembered seeing both Petitioner and Lincoln near the Orin Jewelry store in Garden City, Michigan, on December 19, 2002. Keimig worked for a company adjacent to Orin Jewelers, and on that date, Petitioner and Lincoln mistakenly entered her business looking for the Orin jewelry store.

Petitioner's girlfriend, Doreen Beauchamp, testified that she, Petitioner, and Lincoln were at the Livonia Mall and had a snack near a jewelry store the week before Marco Pesce and his family were murdered.


Based on the evidence obtained, the prosecution opined that the murders occurred somewhere between 5:45 and 6:15 p.m. on the night of December 21, 2002. Ms. Beauchamp,

Petitioner's girlfriend at the time, testified that Petitioner told her that he was on his way to Kentucky during that time period. She said that he told her that he needed to drive there to get the money that his father had for him from the sale of an automobile. According to Ms. Beauchamp's testimony, she met Petitioner through correspondence while he was in prison sometime in late 1997 or early 1998. She said that Petitioner was Dennis Lincoln's bunkmate while they were in prison and that she met Lincoln shortly after he was released in April 2002. It was Ms. Beauchamp's testimony that she traveled with Petitioner's mother, Betty Smith, and his uncle, Billy Smith, to Jackson, Michigan, when Petitioner was released from prison in August 2002. She said that Petitioner often stayed in her mother's home in Livonia.

It was Ms. Beauchamp's testimony that on December 22, 2002, Petitioner arrived at her mother's home and gave her one thousand dollars in cash to pay her credit-card debit. She said that she saw Petitioner periodically in the following days until he was arrested on December 24, 2002. According to Ms. Beauchamp, she remained in contact with Petitioner while he was in jail awaiting trial for these crimes. Letter were exchanged during that period, which were admitted into evidence during the trial. Those letters contained allegations of Billy Smith's involvement in the murders.

During the trial, the prosecution presented numerous witnesses and evidence; circumstantial evidence suggesting that Petitioner and Lincoln were in Livonia on the night of December 21, 2002, and killed the Pesce family. It was established that Petitioner's cellular

telephone and that of co-defendant, Lincoln, were being used in a pattern of back-and-forth activity near the Pesce home on the day in question.

Paula Jo Kottyan was another witness who testified for the prosecution. She said that she loaned Petitioner her truck on December 21, 2002. While she was working at Home Depot in Livonia, Petitioner picked up the keys shortly after 10:00 a.m. He returned the truck between 7:30 and 7:45 p.m., just before Ms. Kottyan was scheduled to get off work. According to her testimony, Petitioner appeared to be wearing the same clothes that she had seen him wear earlier in the day, and the truck was in the same condition as it was when it was loaned to him. The truck was seized for trace evidence but none was obtained.

Tracy Letts testified that she lived two houses away from Billy Smith and across the street from the home where Betty Smith, Petitioner's mother, was temporarily living with her father (Petitioner's grandfather). Ms. Letts said that she knew Petitioner because her children befriended him and helped him around his grandfather's house. According to Ms. Letts' testimony, after she came home from work on December 21, 2002, at about 6:00 p.m., Petitioner came by and gave her money to take her children to McDonald's, while he and his friend, Lincoln, stayed at her house. According to Ms. Letts' testimony, she took her children to McDonald's, and when she returned, she noticed several full garbage bags in the kitchen of her home but did not questioned their contents. Ms. Letts' children testified that earlier that day, while their mother was at work, Petitioner came by the house, took a gun from their mother's room, and told them not to tell anyone.

On that particular night, and according to the testimony of Billy Smith, Petitioner walked down to his house (Smith's house), and asked him for a change of clothing. It was Billy Smith's testimony that Petitioner told him "five dead," and asked him to come over to Ms. Letts' house. Billy Smith complied and witnessed bags of jewelry and a gun. (Trial Tr. Vol XI, pp. 146-147.)

Again, Petitioner repeated the "five dead" comment to his uncle and told him to watch CNN. (Trial Tr. Vol. XI, pp. 150-151.)  Billy Smith then left after Petitioner gave him one thousand dollars to give to his sister, Betty Smith, in order to pay the taxes on his grandfather's house.

On December 22, 2002, Petitioner took Ms. Letts' children to church, and then returned to Ms. Letts' house and began burning paper.  Petitioner stopped that activity, when Ms. Letts asked him to drive her to work, which he did.  However, on the way, Petitioner asked Ms. Letts to throw away a bag in a dumpster.  According to Ms. Letts, when she felt the bag, she said that it felt like it contained a gun.  In fact, the police seized two guns from that bag, along with car keys belonging to Marco and Diane Pesce.  One of the guns was registered to Marco.  Subsequently, on December 23, 2002, Petitioner was melting jewelry in Ms. Letts' bedroom with a blowtorch that burned her bedspread.

Ms. Letts was not aware that Petitioner was arrested until her home was searched by the police on December 24, 2002.  The police seized jewelry from her home that belonged to the Pesce family.

Ms. Letts testified that Petitioner joked to her about robbing a man named Ronald Wedge, the man from whom she rented her home.  According to Ms. Letts' testimony, Mr. Wedge's Canton home was broken into on December 9, 2002, and cash, camera, and jewelry were taken.  At trial, Mr. Wedge identified the other gun found in the garbage bag in the dumpster as being stolen from his home.  That gun was identified as a Davis Industries .380 caliber weapon, and it

was determined that it was the gun that fired the bullet that killed Carlo Pesce.  Additionally,

blood found on the inside barrel of the gun matched that of Melissa Pesce.

The police learned of the evidence in this case largely because of information provided to them by Billy Smith. On December 22, 2002, Petitioner came to the Copa Bar, owned by Billy Smith's wife, Margaret. According to Billy Smith's testimony, Petitioner told him that the "shit he did would be on CNN." (Trial Tr. Vol. XII, p. 11.) According to Smith, he and Petitioner watched the news about the Pesce family murders.

Billy Smith then decided to call a Dearborn Detective, who left a business card at his home after it was raided by the FBI in November 2002. Smith acknowledged that he was the west-side boss of the Devil's Disciples Motorcycle Club but declined to provide information about the club's organization.

However, Steven Phillips, a cousin to Billy Smith and Petitioner, confirmed that he (Phillips) maintained guns for club members at the direction of Billy Smith. Phillips testified that Petitioner requested a gun from him on or about December 17th or 18th, before the Pesce murders. Phillips said that he gave Petitioner an inoperable .32 Berretta, which Petitioner returned on December 22, 2002.

Petitioner's mother, Betty Smith, testified at his trial. She said that her son told her about the crime, stating "I was upstairs, children downstairs, mother downstairs and father downstairs. I went upstairs and heard pop-pop-pop. I ran downstairs. I didn't know what to do. I took care of the guy who killed them. Don't ask me anymore, Mom." (Trial Tr. Vol. V, p. 28.) Ms. Smith acknowledged being on medication during her trial testimony; she had a nervous breakdown and was hospitalized shortly after the crime. According to Ms. Smith's testimony, she feared that her brother would kill her for the things that she said—she told the police that her brother was

involved in criminal activity. When questioned as to whether her son did these terrible things, she testified that she could not believe that he did and said that she would rather be dead than take the stand against her son. Ms. Smith said that she could not remember if she saw her son on the night of December 21st but remembered that her brother gave her one thousand dollars to pay the taxes on their father's house.

Samantha Young, a bartender at the Copa Bar, saw Petitioner and Lincoln at the bar on December 21, 2002, between the hours of 8:30 and 9:00 p.m. until midnight. She said that Petitioner suggested to her that he did something that night that could send him away for the rest of his life. He told her to tell anyone that asked of his whereabouts that evening to say that he was there since 6:00 p.m. that evening.

It was the defense theory that the murders had nothing to do with a robbery. Rather, the crime represented a message sent by members of organized crime. In support, evidence was introduced to show that Marco Pesce was having financial difficulties and wrote checks on closed accounts or accounts with insufficient funds to a consignor. Mr. Pesce's accountant testified that he had a habit of writing post-dated checks and regularly took large sums of money for deposit from his business account into his personal checking account, which he shared with his former wife. He said that Mr. Pesce paid over one thousand dollars in life insurance premiums monthly, and that Diane Pesce was the beneficiary of four of his five policies. Days before his death, Mr. Pesce applied for a loan in the amount of one hundred thousand dollars, for a construction project he was working on, and requested that the check be made payable to him on the Friday before he was murdered.

Additionally, in support of the claim that this was not a robbery, the defense highlighted

that some cash and jewelry remained in the home after the crime. The defense denied

Petitioner's involvement and pointed to the fact that the fingerprints found at the scene of the

crime did not match Petitioner's. Evidence of DNA was collected off of grips and triggers of

weapons discarded in the dumpster but did not match Petitioner's. Fibers and trace evidence

collected from the scene did not match Petitioner. It was the defense's position that there was no

physical evidence directly linking Petitioner to the Pesce home.

During trial, the defense attorney suffered a heart attack and the case was adjourned for

approximately three weeks. Subsequently, the case resumed and Petitioner's jury convicted him

of the above-stated charges.

### III. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this

Court's habeas corpus review of state court decisions. Specifically, 28 U.S.C. § 2254(d) states in

pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim–
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented at the
> State court proceedings.

Under (d)(1), a federal court may grant a writ of habeas corpus under two different

clauses, both of which provide two bases for relief. Under the "contrary to" clause, a federal

court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The words "contrary to" should be construed to mean "diametrically different, opposite in character or nature, or mutually opposed." *Id.*

Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts. *Williams*, 529 U.S. at 407-08. Relief is also available under this clause if the state court decision either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state court decision was "objectively unreasonable" and not simply erroneous or incorrect. *Williams*, 529 U.S. at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

In analyzing whether a state court decision is "contrary to" or an "unreasonable application" of clearly established Supreme Court precedent, a federal court may only look to the holdings, as opposed to dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, 529 U.S. at 412.

## IV. Analysis

### A. Claim I–Pretrial Publicity and Change of Venue Claims

In his first habeas claim, Petitioner alleges that he was denied due process when the trial court failed to grant his motion for change of venue because of the pretrial publicity and wide-spread communal rage regarding his case. The Michigan Court of Appeals rejected this claim.

The United States Supreme Court has held that if prejudicial pretrial publicity jeopardizes a defendant's right to a fair trial by an impartial jury, the court should grant the defendant a change in venue. *Irvin v. Dowd*, 366 U.S. 717, 722-724 (1961); *Ritchie v. Rogers*, 313 F.3d 948, 956 (6th Cir. 2002). Prejudice resulting from pretrial publicity can be presumptive or actual. *Nevers v. Killinger*, 169 F.3d 352, 362 (6th Cir. 1999), *abrogated on other grounds*, *Harris v. Stovall*, 212 F.3d 940, 942-943 (6th Cir. 2000). Presumptive prejudice from pretrial publicity occurs in a case where an inflammatory, circus atmosphere pervades both the courthouse and surrounding community. *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007); *Ritchie*, 313 F.3d at 952-953; *Gall v. Parker*, 231 F.3d 265, 309 (6th Cir. 2000); *Nevers*, 169 F.3d at 362-363; *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) (en banc). For that presumption to apply, the trial must be entirely lacking in the solemnity and the sobriety required of a system that subscribes to any notion of fairness and rejects the verdict of a mob. *Gall*, 231 F.3d at 310; *Nevers*, 169 F.3d at 363. Cases where prejudice from pretrial publicity is presumed are extremely rare, and even pervasive, adverse publicity does not inevitably lead to an unfair trial. *DeLisle*, 161 F.3d at 382.

In a case where pretrial publicity cannot be presumed to be prejudicial, the trial court must still determine whether the publicity rises to the level of actual prejudice. *Ritchie*, 313 F.3d at 962. The primary tool for determining if actual prejudice has occurred is a searching *voir dire* of prospective jurors. *Id.* The court must review the media coverage itself and the substance of

the jurors' statements at *voir dire* to determine whether a "community-wide sentiment" exists against the defendant. *Nevers*, 169 F.3d at 366. Negative media coverage by itself is insufficient to establish actual prejudice, and the existence of a juror's preconceived notion as to the guilt or innocence of the defendant, without more, is not sufficient to rebut the presumption of a prospective juror's impartiality. *Id.* at 366-367. The prospective juror must be able to lay aside his or her impressions or opinions and render a verdict based upon the evidence presented in court. *Ritchie*, 313 F.3d at 962.

In this case, Petitioner and his accomplice, Lincoln, murdered a family of five, three of whom were children. While there was news coverage of the murders preceding trial, it was not extraordinary in extent or substance, given the heinous nature of the crimes.

Prior to trial, Petitioner filed a motion for a separate trial and a change of venue. The trial court acknowledged the publicity but indicated that a change of venue would be inappropriate unless a fair and impartial jury could not be seated. The trial court admonished Petitioner because he himself was talking to the news media.

Subsequently, the trial court arranged for individual *voir dire* of the jurors to allow for the individual questioning of prospective jurors about his or her exposure to media coverage. Prior to *voir dire*, the judge explained to the jurors that the court would ask the initial questions and then would allow each perspective side's counsel to ask follow-up questions of them. The trial judge told the jurors that the specific purpose for individual questioning was to determine potential bias from media coverage.

Jury selection began with the trial court addressing the entire jury panel, asking if anyone heard or read about this case, explaining that news reports are not necessarily accurate, and

asking if anyone believed that they could not be fair in this case.  Several jurors were excused

based on their responses.  The remaining fourteen potential jurors were then called back,

individually, to the jury room for questioning.  The trial court and the attorneys for each side

questioned the individual jurors about their exposure to media coverage regarding this case.

After several sessions of questioning, the trial court concluded that a change of venue was not

warranted because there was not a strong enough "community-wide sentiment" against

Petitioner.  The individual *voir dire* questioning of the jurors took place over a two-day period.

In analyzing this claim, the Michigan Court of Appeals concluded:

> In this case, the record simply does not support defendant's claim
> that the trial court failed to ensure that the jury was impartial.  The
> trial court was aware of the issue of pretrial publicity and took
> appropriate steps to impanel an impartial jury.  Specifically, the
> trial court conducted individual, sequestered voir dire of the
> prospective jurors to determine how much the potential jurors had
> heard or seen from the media and what impact that information
> would have on the jurors' ability to remain unbiased.  In addition,
> apparently mindful of the fact that the "attorneys are more familiar
> with the complexities and nuances of the case" and "are in a better
> position than the trial court to ask in-depth questions designed to
> uncover hidden bias," the trial court also permitted the prosecutor
> and defense counsel to participate in the voir dire.
>
> We reject defendant's contention that the facts of this case are
> similar to the facts in *Tyburski*, where the trial court did not
> sequester the prospective jurors to conduct individual voir dire and
> did not permit the attorneys to participate in the voir dire.
> Moreover, we reject defendant's isolation of certain questions
> posed by the trial court to the prospective jurors to support his
> contention that the trial court's questions were superficial and
> inadequate to expose juror bias because they "lead the jurors to the
> conclusion that they could be impartial."  As we observed above,
> the trial court has wide discretion in the manner it uses to achieve
> the goal of an impartial jury.  Defendant's reliance on isolated
> questions posed by the trial court is unpersuasive when the trial
> court's and the attorney's questions to the venire as a whole were
> probing, thoughtful questions that were designed to uncover any

potential bias caused by the jurors' exposure to pretrial publicity.

We conclude that the trial court, which was on notice of the likelihood of juror bias as a result of pretrial publicity, exercised caution in the manner it conducted voir dire. By conducting individual, sequestered voir dire and permitting the attorneys to ask questions about bias as a result of media exposure, the trial court's conduct went above and beyond what our Supreme Court required in *Tyburski*. In other words, the trial court satisfied its duty "to conduct a thorough and conscientious voir dire designed to elicit enough information for the court to make its own assessment of bias." The record simply does not support defendant's contention that the trial court merely relied on the jurors' self-assessment of bias. Therefore, the trial court did not abuse its discretion in failing to conduct a sufficiently probing voir dire, and defendant was not denied a fair trial.

*People v. Wolfenbarger*, No. 250430, 2005 WL 544162, slip op. at 2-3 (Citations omitted).

Petitioner also contends that it was an abuse of discretion for the trial court to deny his motion to change venue given the amount of media coverage. Petitioner does not argue actual prejudice, rather, Petitioner argues that the prejudice should be presumed. The Michigian Court of Appeals denied this claim, as well, explaining that the number of news stories alone is insufficient to presume prejudice and that, after conducting a review of the media coverage, "the publicity was largely factual and was not invidious and inflammatory." *People v. Wolfenbarger*, No. 250430, 2005 WL 544162, slip op. at 5-6. The Michigan Court of Appeals stated in pertinent part:

The existence of pretrial publicity alone does not necessitate a change of venue. "Rather, to be entitled to a change of venue, the defendant must show that there is either a pattern of strong community feeling against him and that the publicity is so extensive and inflammatory that jurors could not remain impartial when exposed to it . . . or that the jury was actually prejudiced or the atmosphere surrounding the trial was such as would create a probability of prejudice." In this case, defendant contends that community bias must be presumed because of the high percentage

of prospective jurors who were aware of the Pesce family murders. We disagree.

"Juror exposure to . . . newspaper accounts of the crime for which [a defendant] has been charged does not in itself establish a presumption that a defendant has been deprived of a fair trial by virtue of pretrial publicity." According to defendant, the media coverage of defendant's case "reached an unprecedented level" because of technology and the ease of broadcasting such information. Defendant asserts that the Detroit newspapers printed more than one hundred articles covering the murders, that local television stations reported on the murders for more than a month, and that the murders were "often the subject of investigative reports and editorial commentary." The number of articles alone does not result in a presumption of impartiality in all jurors. In *People v. DeLisle*, 202 Mich.App 658, 668-669; 509 NW2d 885 (1993), we rejected the defendant's argument that the trial court erred in denying his motion for a change of venue based on pretrial publicity when there were more than one hundred newspaper articles published over a period of ten months and all the jurors promised to be fair and decide the case solely on the basis of the evidence introduced at trial.

Moreover, while the media coverage of the case was extensive, the newspaper articles were based on the facts of the case and the ensuing investigation and the status of the case after defendant and his codefendant were arrested. There were also some newspaper articles about the victims' funerals. The potential for prejudice is much greater if the publicity is invidious or inflammatory than when the publicity is largely factual. We have carefully reviewed the media reports in this case and conclude that the publicity was largely factual and was not invidious and inflammatory. Moreover, "[t]here is no suggestion of appeal to a 'lunch mob' mentality." We observe that the shocking and cold-blooded nature of the crimes in which five people were killed, four of them execution-style, coupled with the fact that three of the victims were innocent children and one was an elderly woman, renders it nearly impossible for even a factually based written or television news account of the details of the crime not to evoke passion in anyone who reads such an article or views such a news segment. However, the fact that there is no neutral way to report on the murders of five innocent persons is a function of the heinous nature of the crimes themselves, not the result of inflammatory or invidious media reporting. The news reports were based on the

facts of the brutal crimes, the investigation, and the status of the case against defendant and his codefendant. We therefore conclude that the media coverage did not amount to "a barrage of inflammatory publicity" that resulted [in] prejudice against defendant.

Defendant contends that nearly every juror on the case was aware of the case because of pretrial publicity. The record supports defendant's assertion that most of the venire were at least somewhat familiar with the facts of the case. However, exposure to media reports about the defendant and the alleged crime does not automatically establish that the jury was not impartial. "Consideration of the quality and quantum of pretrial publicity, standing alone, is not sufficient to require a change of venue. The reviewing court must also closely examine the entire voir dire to determine if an impartial jury was impaneled." Our review of the jury voir dire reveals that the trial court impaneled an impartial jury. Each of the fourteen jurors who were ultimately selected to sit on defendant's jury asserted that they would be able to judge defendant's case fairly or impartially, notwithstanding their exposure to media reports about the case. Where potential jurors can swear that they will put aside preexisting knowledge and opinions about the case, neither will be a ground for reversing a denial of a motion for a change of venue. We conclude that while most of the venire had been exposed to some pretrial publicity, there was not, as defendant contends, a high percentage of members of the venire who admitted to disqualifying prejudice in this case. Under the totality of the circumstances, the trial court's denial of defendant's motion for a change of venue did not violate defendant's due process rights. His trial was held before an impartial jury.

*People v. Wolfenbarger*, No. 250430, 2005 WL 544162, slip op. at 5-6 (Citations omitted).


Here, a review of the transcript reveals that the trial court did not err in denying

Petitioner's motion. While there may have been some articles in the local community newspaper

that related to the case, juror exposure to those accounts did not in itself establish a presumption

that Petitioner was denied a fair trial because of pretrial publicity. The potential jurors in this

case were extensively questioned by the attorneys and the court to determine if they could be impartial and lay aside any preexisting knowledge and opinions, if any existed. The trial court also repeatedly instructed the venire that any publicity or articles about the case was not evidence and was not to be considered.

On that basis, the Michigan Court of Appeals' decision is neither contrary to, not an unreasonable application of, clearly established Supreme Court precedent. Therefore, Petitioner is denied habeas relief on these claims.

### B. Claim II–Right to a Defense Claim

Petitioner next contends that the trial court's exclusion of hearsay testimony denied him his right to present a complete defense.

"A fair opportunity to present a defense is a constitutional right," *Baze v. Parker*, 371 F.3d 310, 323 (6th Cir. 2004), *cert. denied*, 544 U.S. 931 (2005) (citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)), and "presenting relevant evidence is integral to that right." *Baze*, 371 F.3d at 323 (citing *Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988)). It is one of the "minimum essentials of a fair trial." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). The Supreme Court has described the "most basic ingredients of due process of law" as follows:

> A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense–a right to his day in court–are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.

*Washington v. Texas*, 388 U.S. 14, 18 (1967) (quoting *In re Oliver*, 333 U.S. 257 (1948)).

Further, the Supreme Court described the right to present a defense as follows:

> The right to offer testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a

> defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. at 19.

This right, however, is not absolute and "[s]tates have broad authority to promulgate rules that exclude evidence so long as they are not arbitrary or disproportionate to purposes they are designed to serve." *Baze*, 371 F.3d at 323 (quoting *United States v. Scheffler*, 523 U.S. 303, 308 (1998)). The exclusion of evidence is unconstitutional where it "infringe[s] upon a weighty interest of the accused." *Baze*, 371 F.3d at 324 (citing *Scheffler*, 523 U.S. at 308).

An issue concerning the admissibility of evidence or error in state procedure does not rise to a level of constitutional magnitude unless it can be viewed as so egregious that the petitioner was denied a fundamentally fair trial. *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004), *cert. denied*, 125 S.Ct. 126 (2004). To determine whether the admission or inadmissibility of evidence has denied a defendant's fundamental due process rights, the court should consider the extent to which the evidence is "critical" to the case, whether it "tend[s] to exculpate' the

accused, and whether the evidence bears "persuasive assurances of trustworthiness." *Turpin v. Kassulke,* 26 F.3d 1392, 1396 (6th Cir. 1994) (quoting *Chambers*, 410 U.S. at 297 and 302).

To the extent a petitioner's argument is based upon state law, the petitioner has failed to state a claim upon which habeas corpus relief may be granted. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Baze*, 371 F.3d at 322. A question concerning a perceived error of state law serves

as a basis for habeas corpus relief only when the petitioner is denied fundamental fairness in the trial process. *Estelle v. McQuire*, 502 U.S. 62, 67-68 (1991).

The rulings by a state's highest court with respect to state law are binding on the federal courts. *Wainwright v. Goode*, 464 U.S. 78, 84 (1983). Furthermore, the Supreme Court has "reemphasize[d] that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 68. The federal courts are also bound by decisions of an intermediate state appellate court unless convinces that the highest state court would decide the issue differently. *Olsen v. McFaul*, 843 F.2d 918, 929 (6th Cir. 1988)

In determining whether the exclusion of evidence infringes upon a weighty interest of the accused, the court's role is not to determine whether the excluded evidence would have caused the jury to reach a different result. *Davis v. Alaska*, 415 U.S. 300, 317 (1973). Instead, the question is whether the defendant was afforded "'a meaningful opportunity to present a complete defense.'" *Crane*, 476 U.S. at 690 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). The prosecutor's case must "encounter and 'survive the crucible of meaningful adversarial testing.'" *Crane*, 476 U.S. at 690-691 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)).

Here, the victim Marco Pesce's brother-in-law, Edward Jameel,[2] was interviewed by the prosecution pursuant to an investigative subpoena. During the interview, Jameel asserted that he was in the parking lot of the Copa Bar buying crack cocaine on the night of the murders. The

---

[2]Edward Jameel is the brother of Marco Pesce's former wife, Diane Pesce.

Cope Bar is owned by the wife of Petitioner's uncle, Billy Smith.

The defense called Jameel as a witness at trial but he asserted his Fifth Amendment right against self-incrimination. Defense counsel then moved to have his earlier statement admitted into evidence. The trial court ruled that Jameel's statement was inadmissible hearsay and did not meet the requirements of M.R.E. 804(b)(1) because the motivation to develop Jameel's testimony was different during the investigative interview; Jameel's statement was taken during a time when the prosecution was investigating whether there was a connection between Marco Pesce's wife, Diane Pesce, and the murders. The prosecution was not questioning Jameel about Petitioner's uncle or any connection between Petitioner's uncle and the murders.

The Michigan Court of Appeals, the last court to issue a reasoned a decision in this case, held that the trial court correctly concluded that Jameel's prior testimony did not satisfy the requirements of M.R.E. 804(b)(1) and found any error harmless because Jameel's statement had no bearing on the overwhelming evidence of Petitioner's guilt. The Court of Appeals reasoned as follows:

> Defendant next argues that the trial court abused its discretion in precluding the admission of the prior sworn statement of Edward Jameel, which was made in response to an investigative subpoena issued by the prosecutor. At trial, Jameel asserted his Fifth Amendment privilege against self-incrimination and refused to testify. Thereafter, defendant sought to admit a statement that Jameel made in response to the prosecutor's investigative subpoena in which Jameel asserted that on the night of the victims' murders, he was in the parking lot of the Copa Bar buying crack cocaine. The trial court ruled that Jameel's statement was inadmissible under MRE 804(b)(1) because Jameel's statements were obtained through an investigative subpoena when the prosecutor was gathering facts for the case, and the motive to develop the testimony would not be the same in an investigative subpoena as it would be after the defendant had been arrested and charged. Therefore, the trial court ruled that while Jameel was unavailable,

24

the testimony did not satisfy MRE 804(b)(1).

We review a trial court's interpretation of a rule of evidence de novo and review the trial court's decision whether to admit evidence for an abuse of discretion.

We hold that even if the trial court erred in precluding the admission of Jameel's responsive statement to the prosecutor's investigative subpoena under MRE 804(b)(1), the error was harmless. Defendant is correct that a defendant in a criminal case has a right to present a defense. However, contrary to defendant's argument on appeal, the trial court's exclusion of Jameel's testimony did not preclude him from presenting a defense because Jameel's testimony did not establish a defense for defendant. Defendant asserts that Jameel's statement that on the night of the murders, he was in the parking lot of the Copa Bar buying crack cocaine "was critical to the defense . . . that Billy Smith was somehow involved in this crime" because Smith owned the Copa Bar. We fail to discern how Jameel's statement establishes Smith's involvement in the crimes or a defense for defendant. Moreover, Jameel's statement does not exculpate defendant and therefore would have had no impact on defendant's guilt even if it did tend to inculpate Smith. Jameel's statement would not have diminished the overwhelming evidence that defendant committed the crimes and therefore would not establish a defense for defendant. We hold that any error that the trial court may have made in excluding Jameel's statement under MRE 804(b)(1) was harmless.

*People v. Wolfenbarger*, No. 250430, 2005 WL 544162, slip op. at 5-6 (Citations and footnotes omitted).


This Court finds that the Michigan Court of Appeals' determinations were not contrary to, or an unreasonable application of, clearly established United States Supreme Court precedent. Furthermore, the Court agrees with the state appellate court that, given the overwhelming evidence presented against Petitioner, any possible error must be considered harmless, and Petitioner suffered no actual prejudice. Thus, as the Michigan Court of Appeals stated "any

25

error that the trial court may have made in excluding Jameel's statement under MRE 804(b)(1) was

harmless." *People v. Wolfenbarger*, No. 250430, 2005 WL 544162, slip op. at 6 (Mich.App.Ct.

Mar. 8, 2005).  Therefore, Petitioner is not entitled to habeas corpus relief for this claim.

### C.  Claim III–Right to Counsel Claim

In his third habeas claim, Petitioner argues that he was denied the right to counsel at a

critical stage of the proceedings because the trial court did not appoint stand-in counsel when it

adjourned trial after Petitioner's attorney suffered a heart attack.

The United States Supreme Court has clearly established that the complete denial of

counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice.

*Roe v. Flores-Ortega*, 120 S. Ct. 1029, 1038 (2000); *Penson v. Ohio*, 488 U.S. 75, 88 (1988);

*Cronic*, 466 U.S. at 659.  The existence of certain structural defects in a trial, such as the

deprivation of the right to counsel, requires automatic reversal of the conviction because it

infects the entire trial process.  *Brecht v. Abrahamson*, 507 U.S. 619, 629-630 (1993).  The

United States Supreme Court has routinely found constitutional error without any specific

showing of prejudice to a defendant when counsel is either totally absent, or prevented from

assisting the accused during a critical stage of the proceedings.  *Cronic*, 466 U.S. at 659, fn.25;

*United States v. Minsky*, 963 F. 2d 870, 874 (6th Cir. 1992).

Recently, the Sixth Circuit in *Van v. Jones*, 475 F.3d 292, 311-312 (6th Cir. 2007)

(Moore, J. dissenting), articulated the following in order to determine whether an event rises to

the level of a critical stage of the proceedings:

> 1) A critical stage presents a moment when "[a]vailable defenses
> may be irretrievably lost, if not then and there asserted."

> [*Hamilton v. Alabama*, 368 U.S. 52, 53 (1961)].
>
> 2) A critical stage is one "where rights are preserved or lost." [*White v. Maryland*, 373 U.S. 59, 60 (1963)].
>
> 3) Counsel's assistance is guaranteed "whenever necessary to mount a meaningful defence [sic]." [*United States v. Wade*, 388 U.S. 218, 225 (1967)].
>
> 4) Determination as to "whether a hearing is a 'critical stage' requiring the provision of counsel depends . . . upon an analysis 'whether potential substantial prejudice to defendant's rights inheres in the . . . confrontation and the ability of counsel to help avoid that prejudice.' " [*Coleman v. Alabama,* 399 U.S. 1, 9 (1970) (quoting *Wade,* 388 U.S. at 227)].
>
> 5) A critical stage holds "significant consequences for the accused." [*Bell v. Cone,* 535 U.S. 685, 696 (2002)].
>
> 6) In *Lundberg,* our court defined a "floor" for analysis as to whether a phase in a criminal proceeding may be considered critical. We do not label as a critical stage "proceedings where even the likelihood of later prejudice arising from the failure to appoint is absent." [*Lundberg v. Buchkoe,* 389 F.2d 154, 158 (1968) (quoting *DeToro v. Pepersack,* 332 F.2d 341, 343-44 (4th Cir.1964))].

*Van*, 475 F.3d at 312.

In this case, Petitioner's attorney suffered a heart attack in the courtroom and was taken immediately to the hospital. Both juries were subsequently excused for the day.

Petitioner's jury was seated the next day. At that time, the trial court expressed the following to Petitioner's jury:

> Don't let anybody discuss this with you. Don't let anybody discuss it in your presence. And again, even though you are on standby as it relates to Mr. Wolfenbarger, don't read about any media coverage, read or listen to any media coverage that relates to this trial or even particularly as it relates to that aspect of the trial

that involves Mr. Lincoln because as I've told you before, it's
extremely important that you base your decision only on the
evidence and the testimony that relates to Mr. Wolfenbarger. And,
for example, I'm excusing you from that part of the case which
involves Mr. Lincoln because it would be inappropriate for you to
consider that. So it would be just as inappropriate for you to read
anything about this case as it relates to Mr. Lincoln as well. And I
don't want that to influence your decision-making process as it
relates to Mr. Wolfenbarger.

(Trial Tr. Vol. X, p. 3.)

It is Petitioner's position that he was denied counsel at a critical stage of the proceedings

because the jury was instructed not to discuss or follow coverage of the case and, Petitioner

contends that such instructions to the jury are jury instructions. Jury instructions have previously

been held to be considered a critical stage of the proceedings. *See French v. Jones*, 332 F.3d

430, 436 (6th Cir. 2003). However, the Michigan Court of Appeals denied this claim, essentially

concluding that the trial court's *de minimus* communication held no potential for prejudice or

significant consequence to the defense. It stated in pertinent part:

Defendant next argues that the trial court violated his Sixth
Amendment right to have counsel present at all critical stages of
the proceedings when it failed to appoint temporary or substitute
counsel for defendant before it instructed the jury and adjourned
defendant's trial after defense counsel suffered a heart attack
during trial outside of the jury's presence. We disagree.

The Sixth Amendment to the United States Constitution guarantees
the accused in a criminal prosecution the right to the assistance of
counsel for his defense and applies to the states through the
Fourteenth Amendment. US Const, Am VI; *People v. Crusoe*, 433
Mich. 666, 684 n 27; 449 NW2d 641 (1989). A defendant "is
entitled to counsel not only at trial, but at all 'critical stages' of the
prosecution, i.e., those stages 'where counsel's absence might
derogate from the accused's right to a fair trial." ' *People v. Bladel
(After Remand)*, 421 Mich. 39, 52; 365 NW2d 56 (1984), *aff'd sub
nom Michigan v. Jackson*, 475 U.S. 625; 106 S Ct 1404; 89

28

L.Ed.2d 631 (1986), quoting *United States v. Wade*, 388 U.S. 218, 226-227; 87 S Ct 1926; 18 L.Ed.2d 1149 (1967). The complete denial of counsel at a critical stage of a criminal proceeding is structural error rendering the result unreliable and requiring automatic reversal. *Gideon v. Wainwright*, 372 U.S. 335; 83 S Ct 792; 9 L.Ed.2d 799 (1963); *People v. Duncan*, 462 Mich. 47, 51-52; 610 NW2d 551 (2000).

In this case, the day after defense counsel suffered his heart attack, the trial court informed defendant's jury that it intended to proceed with defendant's codefendant's trial, but that defendant's jury was "on standby" regarding defendant's trial. The trial court told the jurors to go back to work and resume their normal lives for the next couple of days and that the trial court would give them twenty-four hours' notice when they needed to return for defendant's trial. Before adjourning defendant's trial, the trial court instructed the jurors not to discuss the case with anyone or let anyone discuss the case in their presence and not to read or listen to any media coverage of defendant's trial or defendant's codefendant's trial.

Defendant contends that the trial court's communication with the jury amounted to a jury instruction and that jury instructions constitute a critical stage of the proceedings requiring the presence of counsel. We hold that the trial court's communication with the jury following defense counsel's heart attack was not a critical stage in the sense that the absence of counsel " 'might derogate from the accused's right to a fair trial" ' because there was no evidence presented and no circumstance that required the presence of counsel. *Bladel*, *supra* at 52, quoting *Wade*, *supra*, 388 U.S. at 226-227. The trial court's communication with the jury in this case after defense counsel suffered a heart attack was *de minimus* and did not include substantive jury instructions. Rather, the communication was more of a housekeeping type of communication, in which the trial court informed the jury that it was adjourning defendant's trial and instructed the jurors not to read any media coverage regarding the trial. *See People v. France*, 436 Mich. 138, 142-143; 461 NW2d 621 (1990).

*People v. Wolfenbarger*, No. 250430, 2005 WL 544162, slip op. at 6-7 (Footnotes omitted).

This Court finds that Petitioner has failed to demonstrate that the Michigan Court of

Appeals' decision, concluding that the adjournment in this case and the instructions given

thereof was not critical stage of the proceedings, was neither contrary to, or an unreasonable application of, clearly established federal law. Consequently, this Court finds that, even if failure to appoint stand-in counsel could be considered error, any such error was harmless given the overwhelming evidence of Petitioner's guilt. Therefore, Petitioner is denied habeas relief on this claim.

## V. Conclusion

For the reasons stated above, this Court concludes that Petitioner is not entitled to federal habeas relief on the claims presented in his petition.

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a federal district court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. *Id.* at 336-37. When a federal district court denies a habeas claim on procedural grounds without addressing the claim's merits, a certificate of appealability should issue; an appeal of the district court's order may be taken, if the petitioner shows that jurists of reason would find it debatable

30

whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484-85. When a plain procedural bar is present and the district court is correct to invoke it to dispose of the matter, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petition should be allowed to proceed. There, no appeal is warranted. *Id.*

The Court is satisfied that reasonable jurists could not find its ruling debatable. No certificate of appealability is warranted. Nor should Petitioner be granted leave to proceed on appeal *in forma pauperis*. *See* Fed. R. App. P. 24(a).

Accordingly, the Court **DENIES WITH PREJUDICE** Petitioner's petition for writ of habeas corpus.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED** and leave to proceed on appeal *in forma pauperis* is **DENIED**.

**IT IS SO ORDERED.**

s/Bernard A. Friedman_____
Bernard A. Friedman
United States District Judge

Dated: March 19, 2008